UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

JIMMY L. SABIN, et al.       )
                            )
        Plaintiffs,    )     Case No. 1:14-cv-296
                            )
v.                      )     Honorable Paul L. Maloney
                            )
STEVEN KARBER, et al.,    )     **OPINION**
                            )
        Defendants.    )
———————————————————)

This is a civil rights action brought *pro se* under 42 U.S.C. §1983. Plaintiff Jimmy L. Sabin, brings this action on behalf of himself and his sole proprietorship, Heritage Bible Fellowship (HBF). Mr. Sabin's complaint concerns the handling of a portion of the "prodigious" amount of items that he mailed to inmates at the Ionia Correctional Facility (ICF) between January 26, 2011, and January 21, 2014, through HBF. (Compl. at 4-13, ECF No. 1, PageID.4-13). He named five employees of the Michigan Department of Corrections (MDOC) at ICF as defendants: Mailroom Clerks Steven Karber and Craig Lantagne, Assistant Resident Supervisors Erric Smith and Jennifer Gehoski, and Warden John Prelesnik.[1] Plaintiffs sue all defendants in their

---

[1] Mr. Sabin did not proceed *in forma pauperis*. (ECF No. 1). Thus, his claims against defendants were not subject to initial screening under Rule 12(b)(6) standards.

individual capacities and seek declaratory relief[2] and damages. (*Id.* at ¶¶ 6-10, 50, 57, 62, 67, 73, PageID.2-3, 17-23).

Plaintiffs' complaint[3] consists four counts under 42 U.S.C. § 1983 alleging violation of First Amendment Rights, applicable to the States through the Fourteenth Amendment: Count I, violations of the Free Exercise Clause by all defendants; Count II, violation of the Free Speech Clause by all defendants; Count III, retaliation

---

[2]The request for declaratory relief is moot. The parties did not even bother mentioning it in their briefs. Defendants are generally described as "former" holders of the listed positions. (*See e.g.*, ECF No. 74, PageID.516; ECF No. 82, PageID.602; ). The MDOC has adopted a new prisoner mail policy, effective October 1, 2017. *See* http://www.michigan.gov/corrections/0,4551,7-119-68854_68856-428343--,00.html (last visited on September 19, 2017).

[3] Under the provisions of 28 U.S.C. § 1654, a person may prosecute an action either through counsel or *pro se*. A *pro se* litigant, however, is limited to representing himself and may not act in a representative capacity for any other person. *See Lattanzio v. COMTA*, 481 F.3d 137, 139 (2d Cir. 2007). "The statute does not permit unlicensed laymen to represent anyone else other than themselves." *Id.* (quotation omitted); *see Patrick v. Arnsman*, No. 1:15-cv-1201, 2015 WL 6040933, at * 4 (W.D. Mich. Oct. 15, 2015). Mr. Sabin is not a licensed attorney. (*see* Motion Requesting *Pro Bono* Counsel, ECF No.17, PageID.72-73). He cannot represent the interests of anyone else, including the ICF inmates that he mentions in his complaint (ECF No. 1) and affidavit (ECF No. 92). *See* 28 U.S.C. § 1654; *see also Patrick*, 2015 WL 6040933, at * 4.
  Although Mr. Sabin's decision to include his proprietorship as an additional plaintiff adds nothing of consequence to this case. He can proceed *pro se* under 28 U.S.C. § 1654 as a "representative" of his proprietorship because it has no legal existence apart from Mr. Sabin. *See NLRB v. Consolidated Food Servs., Inc.*, 81 F. App'x 13, 14 n.1 (6th Cir. 2003).
  Jimmy Sabin is a convicted felon and registered sex offender. *See Lantagne v. Sabin*, Nos 312269, 315533, 312270, 315532, 2014 WL 2118226, at *1 (Mich. Ct. App. May 20, 2014); *see also* ECF No. 82-6, PageID.772-73. Mr. Sabin has presented no evidence that his felony conviction has been overturned. The only rights at issue in this lawsuit are Mr. Sabin's rights, if any, as a convicted felon attempting mail the various items listed in his complaint to ICF inmates.

by defendants Karber and Lantagne; and Count IV, violation of the right of free association by all defendants. Plaintiffs ask the Court, in the exercise of its discretion, to exercise supplemental jurisdiction over claims defendants violated their rights under provisions of Michigan's constitution and a Michigan statute. (ECF No. 1, PageID.16-22).

The matter is now before the Court on defendants' motion for summary judgment. (ECF No. 73). Plaintiff Sabin as filed his response. (ECF No. 81-82). Defendants filed a reply brief. (ECF No. 86). The Court entered an order directing the parties to correct a series of procedural deficiencies regarding the evidence that had been presented in connection with the pending motion for summary judgment. (ECF No. 90). The parties subsequently filed materials in response to the Court's order (ECF No. 91, 92, 94) and defendants' motion for summary judgment has long been ready for decision.

For the reasons set forth herein, defendants' motion will be granted and judgment will be entered in defendants' favor on all plaintiffs' federal claims. The Court, in its discretion, declines to exercise supplemental jurisdiction over plaintiff's purported state-law claims.

## Applicable Standards

### A.    Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Griffin v. Hardrick*, 604 F.3d 949,

953 (6th Cir. 2010). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Moses v. Providence Hosp. Med. Centers, Inc.*, 561 F.3d 573, 578 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The Court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 676 (6th Cir. 2011).

When the party without the burden of proof seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e); *see Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for

trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990); *see Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 533 (6th Cir. 2012). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252); *see LaQuinta Corp. v. Heartland Properties LLC*, 603 F.3d 327, 335 (6th Cir. 2010).

B.   Qualified Immunity

Defendants argue that they are entitled to summary judgment on plaintiff's claims for damages against them in their individual capacities on the basis of qualified immunity. "Once [an] official[ ] raise[s] the qualified immunity defense, the plaintiff bears the burden to 'demonstrate that the official [is] not entitled to qualified immunity.'" *LeFever v. Ferguson*, 645 F. App'x 438, 442 (6th Cir. 2016) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)); *see Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017).

"A government official sued under section 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014); *see Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015); *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014). The first prong of qualified immunity analysis is whether the plaintiff has alleged facts showing that each defendant's conduct violated a constitutional or statutory right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). The

second prong is whether the right was "clearly established" at the time of the defendant's alleged misconduct. *Id.* Trial courts are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A qualified immunity defense can be asserted at various stages of the litigation, including the summary judgment stage. *See English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994). The qualified immunity inquiry at the summary judgment stage is distinguished from the Rule 12(b)(6) stage in that generalized notice pleading no longer suffices, and the broader summary judgment record provides the framework within which the actions of each individual defendant must be evaluated. At the summary judgment stage, "the plaintiff must, at a minimum, offer sufficient evidence to create a 'genuine issue of fact,' that is, 'evidence on which a jury could reasonably find for the plaintiff.'" *Thompson v. City of Lebanon, Tenn.*, 831 F.3d 366, 370 (6th Cir. 2016); *see Gardner v. Evans*, 811 F.3d 844, 846 (6th Cir. 2016); *see also Zuhl v. Haskins*, 652 F. App'x 358, 361 (6th Cir. 2016).

In *Brosseau v. Haugen*, the Supreme Court examined the underlying purpose of the requirement that the law be clearly established:

> Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, misapprehends the law governing the circumstances she confronted. . . . Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at the time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

543 U.S. 194, 198 (2004); *see also Ziglar v. Abbasi,* 137 S. Ct. 1873, 1867 (2017) ("If a reasonable officer might not have known for certain that the conduct was unlawful -- then the officer is immune from liability.") (quotation and citation omitted); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("The dispositive question is whether the violative nature of the particular conduct is clearly established.") (citation and quotation omitted); *City & County of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) ("An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate.") (citations and quotations omitted); *Mitchell v. Schlabach*, 864 F.3d 416, 424 (6th Cir. 2017). Qualified immunity is an immunity from suit rather than a mere defense to liability. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014).

The Supreme Court has repeatedly held that the second prong of the qualified immunity analysis " 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' " *Brosseau v. Haugen*, 543 U.S. at 198 (quoting *Saucier v. Katz*, 533 U.S. at 201); *see White v. Pauly*, 137 S. Ct. 548, 552 (2017). Moreover, courts are "not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 134 S. Ct. at 2023 (citations and quotations omitted); *see White v. Pauly*, 137 S. Ct. at 552. In order to be

clearly established, existing precedent must have placed the unlawfulness of the official's conduct "beyond debate." *Plumhoff*, 134 S. Ct. at 2023; *Mitchell*, 864 F.3d at 424.

"The burden of convincing a court that the law was clearly established 'rests squarely with the plaintiff.'" *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999) (quoting *Cope v. Heltsley*, 128 F.3d 452, 459 (6th Cir. 1997)); *see Estate of Hill v. Miracle*, 853 F.3d at 312 ("[T]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.") (quotation and citation omitted). The burden applies to each claim that the plaintiff is asserting against a defendant. *See Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015).

### Findings of Fact

The following facts are beyond genuine issue. Plaintiff Jimmy L. Sabin is a convicted felon, formerly held in the custody of the Michigan Department of Corrections (MDOC). He is currently a resident of Vassar, Michigan. At all times relevant to this lawsuit, defendants were employed by the Michigan Department of Corrections (MDOC) at the Ionia Correctional Facility (ICF).[4] The defendants are Mailroom Clerk Steven Karber, Mailroom Clerk Craig Lantagne, Assistant Resident Supervisor (ARUS) Erric Smith, ARUS J. Gehoski, and ICF's Warden John Prelesnik.

---

[4]ICF houses "level V prisoner[s], a classification reserved for the prison system's most dangerous or unmanageable prisoners." *Jackson v. Stoddard*, No. 1:13-cv-1297, 2014 WL 2862614, at *1 (W.D. Mich. June 24, 2014). "Level V is the highest security level of the five-level Michigan classification system[.]" *Mays v. Gorman*, No. 1:11-cv-694, 2013 WL 504234, at *1 (W.D. Mich. Feb. 12, 2013).

Mr. Sabin is a "regular and prodigious sender of mail" to inmates in the MDOC's custody. (Sabin Aff. ¶ 3, ECF No. 92, PageID.900). He generally does not identify himself as the sender of these materials. Instead, he uses a post office box address in Vassar, Michigan, and sends material to ICF "under the auspices" of a sole proprietorship, which he refers to as the Heritage Bible Fellowship (HBF). (*Id.* at ¶ 2, PageID.900). Mr. Sabin refers to himself as HBF's "founder and operator." (*Id.*). Sabin's affidavit does not specify his religion. It does state that HBF is a "Messianic Christian prison ministry" without further elaboration of this faith and its religious practices. (*Id.*). There is no evidence before the Court connecting any of the mail rejections at issue in this lawsuit with any religious practice.

Plaintiff Sabin states that in 2011, he received six Notices of Package/Mail Rejections issued by Mailroom Clerk Craig Lantagne and thirty issued by Mailroom Clerk Steven Karber. (Sabin Aff. ¶ 8, ECF No. 92, PageID.902). With the exception of the photocopy of a newspaper clipping (ECF No. 82-1, PageID.670, 672, 82-4, PageID.712), plaintiffs have not supported their claims against defendants with copies of the specific mail items that they now contend were wrongfully rejected.

A Notice of Package/Mail Rejection is an initial step in the MDOC's process of determining whether and item of incoming mail believed to be contraband will be excluded. (Karber Dep. at 19-20, ECF No. 82-6, PageID.773-74). The Notice identifies the item and the reason(s) why it is believed to be in violation of policy. The prisoner is provided with a copy of the Notice and a copy is sent to the sender, if a return address is provided. (Policy Directive 05.03.118 (effective 09/14/09), ¶ OO, ECF No. 74-

3, PageID.557). The sender's means of appealing the Notice of Package/Mail Rejection is by mailing a letter addressed to the facility head within ten days after the date of the Notice appealing the proposed rejection. (*Id.* at ¶ YY, PageID.558). Although plaintiff Sabin states that he filed appeals on "multiple occasions," the only instances supported with documentation are a May 8, 2011, letter objecting to Notice of Package/Mail Rejection # 0411-120, and a March 2, 2012 appeal from Notice of Package/Mail Rejection # 0212-073. (Sabin Aff. ¶ 16, PageID.904; ECF No. 82-1, PageID.670-73, 678-79). A sender is notified in writing if his appeal is granted or denied. If the appeal is granted, that decision is noted on an Administrative Hearing Report and the prisoner is allowed to receive the mail. (Policy Directive 05.03.118, ¶ YY, ECF No. 74-3, PageID.558).

In cases where a Notice of Package/Mail Rejection has been issued, MDOC prisoners have means at their disposal for challenging a proposed mail rejection. Unless the prisoner waives his right to a hearing in writing or the prisoner and staff agree as to the appropriate disposition of the mail, a hearing is conducted. The hearing officer is not the person who issued the Notice. (*Id.* at ¶ PP, PageID.557; Karber Dep. at 22-23, ECF No. 82-6, PageID.776-77; Lantagne Dep. at 24, ECF No. 82-7, PageID.788). Acting as a hearing officer is one of the duties of an assistant resident supervisor (ARUS). (Policy Directive 05.03.118, ¶ PP, QQ, ECF No. 74-3, PageID.557; ECF No. 82-3, PageID.699-700). If a hearing is conducted, an Administrative Hearing Report is completed by the hearing officer. If the hearing officer finds that the item of mail does not violate policy, the prisoner is entitled to receive it. (Policy Directive

05.03.118, ¶ SS, ECF No. 74-3, PageID.557). If the hearing officer finds that the item is contraband, the prisoner can appeal the decision through all three steps of the MDOC's grievance process. (*Id.* at ¶ XX, PageID.558). The process for disposition of rejected mail is defined by the policy directive. With few exceptions, such as where mail is turned over to law enforcement officials for possible criminal prosecution, the prisoner has the option of returning the mail to the sender at his own expense. (*Id.* at ¶¶ RR-TT, ZZ-AAA, PageID.557-59).

The evidence generated in connection with the challenged Notice of Package/Mail Rejections that the parties have supplied[5] is addressed in chronological order by year below.

## 2011

1.  # 0411-120

On April 26, 2011, defendant Karber issued a Notice of Package/Mail Rejection. The Notice indicated that a Detroit Free Press article, dated April 18, 2011, sent by HBF to prisoner Bout was being rejected because it provided details regarding another prisoner's crime. (ECF No. 74-2, PageID.528; *see also* ECF No. 82-4, PageID.712).

On May 8, 2011, plaintiffs sent a letter to Warden Prelesnik appealing Notice of Package/Mail Rejection # 0411-120. (ECF No. 82-1, PageID.670-73). This appeal

---

[5]Plaintiffs failed to submit evidence supporting their claims that other Notice of Package/Mail Rejections and hearing decisions by defendants violated their constitutional rights. (*See* ECF No. 1. PageID.7-13). The Court expressly advised plaintiffs that their complaint was "not properly verified" because it was based on "information and belief," and that it would not be considered as an affidavit in opposition to defendants' motion for summary judgment. (ECF No. 90, PageID.891).

included a photocopy of the heading from the newspaper clipping, but not the underlying article.  (*Id.* at PageID.670, 672).  Plaintiffs did not submit a copy of the warden's response.

## 2. # 0511-016

On May 4, 2011, Defendant Karber issued Notice of Package/Mail Rejection # 0511-016.  He indicated that the Notice had been issued because it was a "Copy of a Newspaper Article from the Detroit Free Press on another MDOC inmate."[6]  The mail had been sent by Sabin through HBF to prisoner Murphy.  (ECF No. 82-4, PageID.713).  On May 11, 2011, ARUS Erric Smith conducted an administrative hearing, found that this article did not pose a threat to the facility, and prisoner Murphy was allowed to have the article.  (*Id.* at PageID.714; ECF No. 82-4, PageID.706).

## 3. # 0811-054

On August 8, 2011, Lantagne issued Notice of Package/Mail Rejection # 0811-054.  The mail was from HBF to prisoner Murphy.  It was rejected for the following reasons: "Hand written pages contain code/underline words/#8's Bottom of page 4, top of page 5, Threats toward staff.  Recall petition forms/1 instruction sheet - Denied by Warden Prelesnik."  (ECF No. 82-1, PageID.682).

---

[6]The inmate had been convicted of criminal sexual conduct.  The victim was a nine year old girl.  Her assailant had climbed through her bedroom window in the early morning hours and raped her.  (ECF No. 82-4, PageID.712).  A comparison of the headings (ECF No. 82-1, PageID. 670-73; ECF No. 82-4, PageID.712) suggests that this was the same April 18, 2011, newspaper article that had been sent to prisoner Bout and was the subject of Notice of Package/Mail Rejection # 0411-120.

On August 15, 2011, ARUS Smith acted as the hearing officer for the hearing on Notice of Package/Mail Rejection # 0811-054. The Administrative Hearing Report described the items as handwritten pages that appeared to contain a code of underlined words and numbers, threats towards staff, and a recall petition form with an instruction sheet "Denied by Warden Prelesnik." It was determined that these items constituted contraband. (ECF No. 74-2, PageID.537; ECF No. 82-4, PageID.707). Prisoner Murphy was not successful in his attempt to have this decision overturned through the MDOC's grievance process.[7] Prisoner Murphy had numerous alternative means available to educate himself regarding Michigan government and the political process. (ECF No. 82-4, PageID.707, 716-22).

4.    # 0811-061

On August 10, 2011, Lantagne issued Notice of Package/Mail Rejection # 0811-061. He indicated that this item was being rejected because it contained a detailed map and a coded letter. (ECF No. 82-1, PageID.683). Plaintiff Sabin states that in almost all his hand printed letters to prisoners he underlines words as a method of emphasis, rather than a code.[8] (Sabin Aff. ¶14, ECF No. 92, PageID.903). ARUS Smith found no discernable code in the underlined words. He attributed what

_____

[7]Murphy's grievance described the petition form as follows: "Sample blank Recall Petitions for Michigan Governor Rick Snyder and Vassar County Clerk." (ECF No. 82-4, PageID.716).

[8]It is appropriate to note that Plaintiff Sabin has not found it necessary to use this method of emphasis in any of the materials that he has filed with the Court. (*See e.g.*, ECF No. 1, 17, 20, 52, 82, 91, 92). Plaintiff Sabin is capable of communicating without resort to unusual underlining.

appeared to be random underlining as a personal quirk of the author. Smith came to the "conclusion that the writer of said letter writes oddly underlining different words," and expressed hope that he was right by thinking that there was no malice involved. Prisoner Murphy was allowed to possess the letter but was not permitted to possess the detailed map. (ECF No. 74-2, PageID.538).

Prisoner Murphy states that after he was transferred to the Bellamy Creek Correctional Facility in 2012, he was able to obtain from Sabin a "USGS National Water Information System Mapper photograph of the Sabin homestead" without having a Notice of Package/Mail Rejection issued by MDOC employees at Bellamy Creek. Murphy considers the USGS photograph to be the as the equivalent of the rejected Google map. (Murphy Aff. ¶ 7, ECF No. 82-4, PageID.707, 723).

   5.   # 0911-040

On September 13, 2011, Lantagne issued Notice of Package/Mail Rejection # 0911-040. (ECF No. 74-2, PageID.529). Plaintiff Sabin describes the mail that was the subject of this Notice of Package/Mail rejection as a "2011-2012 Opinion Petition to the Michigan Legislature." Sabin states that his purpose in sending such petitions to prisoners was "to enable passing on the petitions to the inmates' families to gather signatures among friends and the public." (Sabin Aff. ¶ 15, ECF No. 92, PageID.903). ARUS Gehoski conducted the administrative hearing on Notice of Package/Mail Rejection # 0911-040. Ms. Gehoski determined that the rejection of the mail was appropriate. (ECF No. 74-2, PageID.539; ECF No. 82-4, PageID.707; ECF No. 82-3, PageID.702).

Prisoner Murphy sought review of this decision through the MDOC's grievance process. (ECF No. 82-3, PageID.702; ECF No. 82-4, PageID.731). The MDOC found at Step III of the grievance process that the description that Mr. Lantagne provided in the Notice was deficient. "A new Notice and administrative hearing would be in order, however, the record indicates that the document was returned to the sender on 12-14-11. No further action is necessary pursuant to the grievance process." (ECF No. 82-4, PageID.730).

6.   # 1011-020

On October 25, 2011, Mr. Karber issued Notice of Package/Mail Rejection # 1011-020. Mail sent from the HBC's post office box was being rejected because it posed a threat to prison security. Karber indicated that it was a "Detailed News Article on the Prison Riots of Attica: The New York Times Thursday, September 8, 2011[.]" (ECF No. 74-2, PageID.530; ECF No. 82-4, PageID.732). ARUS Gehoski conducted the administrative hearing. She determined that the item posed a threat to the security and good order of the prison and encouraged criminal activity. (ECF No. 72-4, PageID.540; ECF No. 82-3, PageID.702; ECF No. 82-4, PageID.708, 735).

7.   # 1111-115

On November 16, 2011, Lantagne issued Notice of Package/Mail Rejection # 1111-115. Mail sent from HBF to prisoner Murphy was being rejected because it included copies of a publication and table of contents that were not direct from the publisher in violation of PD 05.03.118 ¶¶ CC. ARUS Gehoski conducted the administrative hearing. Ms. Gehoski affirmed the rejection of a 118 page document

entitled "Tolerating Failure: The State Health Care and Mental Health Delivery in the Michigan Department of Corrections" and a 58 page document entitled "Psychiatric Effects of Solitary Confinement Stuart Grassian" under this policy directive. ARUS Gehoski also upheld the rejection of a "Google search of Stuart Grassian" because it contained personal information regarding Grassian and Grassian's family. The materials in this package were voluminous and prisoner Murphy was permitted to receive many items. ARUS Gehoski wrote: "The following papers will be given to Murphy as they are not a violation of Policy and do not jeopardize the safety and security of the institution: 'Overview: Neuropsychiatric Effects of Solitary Confinement'; Internet article on Brant D. Fries, PhD.; 'Testimony of Impact of Isolation, July 19, 2005,' and 2 papers that have copies of newspaper articles on them." (ECF No. 74-2, PageID.541; ECF No. 82-3, PageID.702; ECF No. 82-4, PageID.709, 740-41). Murphy subsequently sought to obtain rejected items through the MDOC's grievance process. On November 29, 2012, the MDOC's Grievance and Appeals Section issued a Step III decision overturning the rejection of the Google search results regarding Professor Grassian because it appeared to contain only professional information regarding the mental health care professional, not personal information. (ECF No. 82-4, PageID.744).

8.      # 1111-142C

ARUS Gehoski conducted the administrative hearing on Notice of Package/Mail Rejection # 1211-0142C issued by defendant Karber. Gehoski upheld the rejection of this material sent to prisoner Murphy because the sheets of paper providing names,

addresses and telephone numbers were not permitted under MDOC policy. (ECF No. 72-4, PageID.531, 543; ECF No. 82-3, PageID.702; ECF No. 82-4, PageID.709-10).

9.    # 1211-037

This mail rejection was issued by Karber and affirmed by Gehoski. It was two sheets of paper with contained names and addresses and phone numbers which were not allowed by policy. The rejection was affirmed because it contained personal information not allowed by policy. (ECF No. 74-2, PageID.532, 543; ECF No. 82-3, PageID.703; ECF No. 82-4, PageID.710).

10.    # 1211-063

On December 20, 2011, Karber issued Notice of Package/Mail Rejection # 1211-063. (ECF No. 74-2, PageID.533). The notice indicated that mail from HBC to prisoner Murphy was being rejected because it posed a threat to the security of the prison facility and staff members. (*Id.*; ECF No. 82-4, PageID.745). ARUS Gehoski conducted the administrative hearing and determined that the materials constituted a threat to the security, good order, and discipline of the facility. (ECF No. 74-2, PageID.544; ECF No. 82-3, PageID.703; ECF No. 82-4, PageID.710).

11.    # 1211-084

On December 22, 2011, Karber issued Notice of Package/Mail Rejection # 1211-084. Mail from HBC to prisoner Murphy was being rejected because it was a apparent attempt to circumvent the mail policy "by sending in address's [sic] personal information etc." (ECF No. 74-2, PageID.534; ECF No. 82-4, PageID.747). ARUS Gehoski conducted the administrative hearing and upheld the mail rejection. The mail

contained staff personal information that constituted a threat to the safety and good order of the facility. (ECF No. 74-2, PageID.545; ECF No. 82-3, PageID.703).

<u>2012</u>

On or about January 17, 2012, ICF Mailroom Clerks Karber and Lantagne initiated state court proceedings seeking personal protective orders against Mr. Sabin. On January 29, 2013, the Ionia County Circuit Court Judge Suzanne Kreeger entered a personal protection orders (PPOs) prohibiting Jimmie Lee Sabin from various forms of contact with Steven Karber or Craig Lantagne, including sending their personal information to anyone including code names or ways to identify Karber or Lantagne. (ECF No. 18-1, PageID.89-90; Sabin Aff. ¶ 7, ECF No. 92, PageID.901; *see Lantagne v. Sabin*, Nos 312269, 315533, 312270, 315532, 2014 WL 2118226, at *1 (Mich. Ct. App. May 20, 2014)). Plaintiff Sabin is a convicted felon who was held in MDOC custody "from 1990 to 1999." 2014 WL 2118226, at *1. Sabin "founded the Heritage Bible Fellowship (HBF), which [i]s a non-profit 'ministry' that correspond[s] with prisoners within the [MDOC]." *Id.*

Mr. Sabin's effort to convince Judge Kreeger to terminate her orders proved unsuccessful. According to Sabin, the initial PPOs prohibited him, and HBF by association, from discussing Steven Karber or Craig Lantagne by name, job title, or code. (Sabin Aff. ¶ 7, ECF No. 92, PageID.901) (citing ECF No. 18-1, PageID.89-90)). Judge Kreeger rejected Sabin's arguments that his communications with prisoners had been constitutionally protected and served a legitimate purpose. 2014 WL 2118226, at *1. Judge Kreeger extended her PPOs after finding that Mr. Sabin's letters to

prisoners, which Lantagne and Karber were required to review, were "harassing" and "reasonably caused [Lantagne and Karber] to suffer emotional distress." *Id.*

Plaintiff Sabin indicates that in 2012, he received four Notice of Package/Mail Rejections from Defendant Lantagne and none from Defendant Karber. (Sabin Aff. ¶ 8, ECF No. 92, PageID.902). The record contains documents related to one Notice of Package/Mail Rejection.

12.  # 0212-073

On February 17, 2012, Lantagne issued Notice of Package/Mail Rejection # 0212-073. It related to mail HBF sent to prisoner Murphy and indicated that the mail was being rejected because it contained "prisoner information and current locations." (ECF No. 74-2, PageID.535; ECF No. 82-4, PageID.752). R. Ault conducted the administrative hearing and upheld the rejection of this mail because it was considered a threat to the prison's order and security. (ECF No. 74-2, PageID.546; ECF No. 82-4, PageID.710-11).

On March 2, 2012, plaintiffs filed an appeal to Warden Prelesnik of Notice of Package/Mail Rejection # 0212-073. (Sabin Aff. ¶ 18, ECF No. 92, PageID.904; ECF No. 82-1, PageID.678-79). Plaintiffs did not submit a copy of the warden's response.

### 2013

On January 28, 2013, Lantagne and Karber filed a motion asking Judge Kreeger to order Mr. Sabin to show cause why he should not be held in contempt for violating her PPOs. Judge Karber issued new PPOs in 2013, in part based on evidence that Mr. Sabin, a convicted felon, was seeking information regarding Lantagne and Karber

through FOIA requests and private investigators. Judge Kreeger conducted a hearing on the request for the order to show cause and Mr. Sabin's motion to terminate the PPOs. Judge Kreeger denied the relief requested by all parties. 2014 WL 2118226, at *1-2.

Plaintiff Sabin indicates that in 2013, he received one Notice of Package/Mail Rejection from Defendant Lantagne and none from Defendant Karber. (Sabin Aff. ¶ 8, ECF No. 92, PageID.902). The only documentation provided is related to Package/Mail Rejection # 0113-049.

13.    # 0113-049

On January 18, 2013, defendant Lantagne issued Notice of Package/Mail Rejection # 0113-049. He indicated that mail from HBF addressed to prisoner Whalen was being rejected because it contained details of crimes in articles, was accompanied by a hand written letter that contained information about MDOC employees, and the sender had "many harassing and threatening comments towards certain ICF staff members." (ECF No. 74-2, PageID.536). On January 23, 2013, ARUS Smith conducted an administrative hearing on this notice. He found that the articles included in this package were news items that did not pose a threat to ICF's security and prisoner Whalen was allowed to have them. ARUS Smith upheld the rejection of the two letters, one typed and one hand written, because they contained harassing and threatening language toward MDOC staff. (ECF No. 74-2, PageID.547).

In January 2014, Judge Kreeger extended her PPOs against Mr. Sabin in favor of defendants Lantagne and Karber for another three years.[9] (ECF No. 18-1, PageID.95-96).

Plaintiff Sabin stated that in 2014, he received three Notice of Package/Mail Rejection from Defendant Karber and none from Defendant Lantagne. (Sabin Aff. ¶ 8, ECF No. 92, PageID.902). Plaintiffs presented no documentation related to the underlying Notice of Package/Mail Rejections or administrative hearings.[10]

On March 18, 2014, Plaintiff Sabin filed his lawsuit on behalf of himself and his sole proprietorship, HBF. (ECF No. 1).

On May 20, 2014, the Michigan Court of Appeals rejected Mr. Sabin's challenges to Judge Kreeger's PPOs, affirmed her decisions and awarded taxable costs against Mr. Sabin. *Lantagne v. Sabin,* 315532, 2014 WL 2118226, at *3-4. The appellate court observed that the trial court found, upon assessment of credibility and contemplation of the facts "as viewed in the context of the unique circumstances and prison setting, that [Mr. Sabin's] actual intent or purpose relative to including certain information and statements in the various communications was to harass [Lantagne and Karber] and not to legitimately conduct HBF affairs, legitimately seek redress of grievances,

---

[9]No party has advised the Court regarding whether the PPOs were extended past the January 29, 2017, expiration date.

[10]Plaintiffs' complaint indicated that the items at issue that they sent in 2014 were rejected because they violated Judge Kreeger's PPOs. (ECF No. 1, PageID.13). As noted above, plaintiffs provided no supporting documentation.

or to legitimately pursue the enforcement of policies. The trial court effectively concluded that the particular statements and information at issue that were contained in [Mr. Sabin's] communications or attempted communications to prisoners, and particularly the high escape-risk prisoner serving multiple life sentences,[11] were not employed to serve a legitimate purpose. Rather, the trial court found that the statements and information were meant to frighten, harass, and intimidate [Lantagne and Karber], given that [Mr. Sabin] was fully aware that [Lantagne and Karber] would, as part of their job duties, be reading the communications at issue, and considering that potentially dangerous prisoners were part of the equation. The trial court also made reference to suspicious activities at [Lantagne and Karber's] homes and [Mr. Sabin's] hiring of a private investigator." 2014 WL 2118226, at *2. The Michigan Court of Appeals held that the trial court did not commit error in finding that Mr. Sabin's conduct was not constitutionally protected and it did not serve a legitimate purpose, because it had been intended, at least in part, "to frighten, harass, and intimidate" Karber and Lantagne. 2014 WL 2118226, at *3.

On July 2, 2014, Judge Kreeger conducted a show cause hearing. She found that Mr. Sabin violated the PPOs. She ordered that Mr. Sabin be sentenced to fourteen

---

[11]Prisoner Murphy was held in administrative segregation at ICF after his unsuccessful attempt to escape from the Kinross Correctional Facility by digging a tunnel. *See Murphy v. Lockhart*, 826 F. Supp. 2d 1021 (E.D. Mich. 2011); *see also Hoffman v. Ritter*, No. 2:10-cv-269, 2011 WL 4560916, at * 5 (W.D. Mich. Aug. 24, 2011).

days in the county jail, with "sentence suspended pending strict compliance with the PPO[s]." (ECF No. 18-4, PageID.99-100).

On September 29, 2014, the Michigan Supreme Court denied Mr. Sabin's application for leave to appeal. *See Lantagne v. Sabin*, 853 N.W.2d 362 (Mich. 2014). On March 9, 2015, the Supreme Court of the United States denied Mr. Sabin's petition for a writ of certiorari. *See Sabin v. Karber*, 135 S. Ct. 1532 (2015).

## Discussion

### I.     Claims for Damages Stemming PPO Litigation in Michigan's Courts

Although it is not listed as a separate count, plaintiffs appear to be claiming an entitlement to damages stemming from the PPO orders entered and enforced in Michigan's courts. (ECF No. 1, PageID.14-16). Federal courts are courts of limited jurisdiction, which may exercise only those powers authorized by the Constitution and statute. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1064 (6th Cir. 2014). Accordingly, "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (citations omitted). The first and fundamental question presented by every case brought to the federal courts is whether it has jurisdiction to hear a case, even where the parties concede or do not raise or address the issue. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986); *see also Vander Boegh*, 772 F.3d at 1063.

"Federal district courts do not stand as appellate courts for decisions of state courts. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). The *Rooker–Feldman* doctrine 'prevents a federal court from exercising jurisdiction over a claim alleging error in a state court decision.' *Luber v. Sprague*, 90 Fed. Appx. 908, 910 (6th Cir. 2004). Federal courts' 'authority to review a state court's judgment' is vested 'solely in [the Supreme] Court.' *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 292, 125 S. Ct. 1517, 161 L.Ed.2d 454 (2005)." *Hall v. Callahan*, 727 F.3d 450, 453 (6th Cir. 2013).

"To determine whether the plaintiff[s'] complaint seeks appellate review of a state court decision or instead asserts an independent claim for relief, the federal court must examine 'the source of the injury the plaintiff alleges in the federal complaint.'" *Durham v. Haslam*, 528 F. App'x 559, 563 (6th Cir. 2013) (quoting *McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006)). "Rooker-Feldman focuses on whether the state court decision caused the injury," and this Court "cannot determine the source of injury without reference to the plaintiff[s'] request for relief." *Berry v. Schmitt*, 688 F.3d 290, 299 (6th Cir. 2012) (citations and quotations omitted); *see Durham*, 528 F. App'x at 563. Here, among other things, plaintiffs seek to recover as damages all litigation expenses related to the state court personal protective orders based on a theory that the orders were "vexatious" and a "sham." (*see* Compl. ¶¶ 33-35, 41, PageID.14, 16).

The validity of the state court orders has been established and it cannot be revisited here. Plaintiffs' attempts to overturn the orders through the state courts and Supreme Court have failed, and plaintiffs have exhausted all available means of appellate review. The state court orders are final and this court lacks jurisdiction to entertain a collateral attack. Under the *Rooker-Feldman* Doctrine, a party who lost in state court may not complain about injuries caused by state-court judgments in a subsequent federal lawsuit. *See Saudi Basic Indus. Corp.*, 544 U.S. at 284. This Court does not possess direct oversight powers over Michigan's courts. *See In re Cook*, 551 F.3d 542, 548 (6th Cir. 2009). Thus, if plaintiffs are claiming damages stemming from the PPO orders entered in Michigan's courts, those claims must be dismissed for lack of jurisdiction.[12]

## II.     Section 1983

Plaintiffs invoke 42 U.S.C. § 1983 (ECF No. 1, PageID.1) and claim violations of their First Amendment rights. Section 1983 states in pertinent part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or

---

[12] The question of jurisdiction is being considered *sua sponte*. The *res judicata* effect of the decisions of Michigan's courts it not. Although the Supreme Court and Sixth Circuit have recognized that lower courts can consider the affirmative defense of the *res judicata* effect of state court decisions *sua sponte* under "special circumstances," the facts of this case do not warrant any departure from the "general rule." *See Neff v. Flagstar Bank, FSB*, 520 F. App'x 323, 326-27 (6th Cir. 2013) (collecting cases).

immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983.  HBF is not a person under section 1983.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 63-70 (1989); *accord In re Christenberry*, 336 BR 353, 356 (Bankr. E.D. Tenn. 2005).

Further, a proprietorship has no constitutional rights of its own because it lacks a separate legal existence apart from its owner.  *See NLRB v. Consolidated Food Servs., Inc.*, 81 F. App'x at 14 n.1; *see also United States v. Fox*, 721 F.3d  32, 36 (2d Cir. 1983).  Although the plural "plaintiffs" appears throughout this Opinion based on the form of the pleadings, it must be remembered that the underlying rights, if any, belong to one person, Mr. Sabin, HBF's owner.  Plaintiff Sabin succinctly noted in an earlier submission to the Court, that HBF and Mr. Sabin "are one in the same." (Answer to Order to Show Cause at 3, ECF No. 3, PageID.28).

Section 1983 is not itself a source of any substantive right, but merely provides a remedy for deprivation of rights that are elsewhere conferred by federal law.  *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989); *see also Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010) ("Section 1983 does not confer substantive rights but merely provides a means to vindicate rights conferred by the Constitution or laws of the United States.").  Accordingly, the Court will proceed to address Plaintiffs' claims that defendants violated Mr. Sabin's First Amendment rights, applicable to the State through the Fourteenth Amendment's Due Process Clause.

A.    First Amendment Free Exercise Claim

Plaintiffs allege in Count I of their complaint that all defendants violated their rights under the First Amendment's Free Exercise Clause.  (Compl. at 16-18, ECF No. 1, PageID.16-18).  The Free Exercise Clause states:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. CONST. amend. I.  It has been applied to the States through the Fourteenth Amendment's Due Process Clause.  *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349-350 (1987).  The familiar Turner factors are: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remains open to prison inmates; (3) what impact that accommodation of the asserted constitutional right will have on other guards and inmates; and (4) whether there are other readily available alternatives at a *de minimis* cost to valid penological interests.  *Turner*, 482 U.S. at 89-91.

Lawful incarceration legitimately requires the retraction or withdrawal of many rights and privileges as a necessary consequence of society's need to deter and punish crime.  *O'Lone*, 482 U.S. at 348.  "The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological

objectives-including deterrence of crime, rehabilitation of prisoners, and institutional security." *Id.* "The Supreme Court has held that in most circumstances, prison officials 'should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). "[S]uch a standard is necessary 'if prison administrators ..., and not the courts [are] to make the difficult judgments concerning institutional operations." *Turner*, 482 U.S. at 89 citing *Jones v. North Carolina Prisoner's Union*, 433 U.S. 119, 128 (1977)). "Subjecting day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decision making process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby 'unnecessarily perpetuat[ing] the involvement of the federal courts in the affairs of prison administration.'" *Turner*, 482 U.S. at 89 (citing *Procunier v. Martinez*, 416 U.S. 396, 407 (1974)).

Defendants seek summary judgment on the basis of qualified immunity. The first prong of qualified immunity analysis is whether the plaintiff has alleged and

supported with evidence facts showing that the defendant's conduct violated a constitutional or statutory right. *See Saucier v. Katz*, 533 U.S. at 201. The second prong is whether the right was "clearly established at the time of the defendant's alleged misconduct." *Id.* Trial courts are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first. *See Pearson v. Callahan*, 555 U.S. 223 (2009). Plaintiffs elected not to address either prong of the qualified immunity analysis. Instead, plaintiffs elected to ignore their burden in favor of characterizing defendants' qualified immunity defense as "perfunctory" and "hardly warranting an in-depth response." (Plaintiffs' Brief at 20-21, ECF No. 82, PageID.622-23). It was plaintiffs' burden to demonstrate, with regard to each item of mail, how the action each defendant took with regard to that item violated Mr. Sabin's clearly established constitutional rights. *See Mitchell v. Schlabach*, 864 F.3d at 424. Plaintiffs have presented nothing approaching their burden.[13]

Plaintiffs' other "argument," that defendants' assertion of qualified immunity "makes no sense," because where there is "no claim under § 1983" the defense has "no

---

[13]Although the briefing filed in this matter by all parties is less than exemplary, defendants' briefs are not so deficient that the issue of qualified immunity has been waived. In the same vein, the Court has not deemed any of plaintiffs' claims against defendants to have been abandoned based on plaintiffs' failure to present argument in support of those claims in response defendants' motion for summary judgment, which clearly seeks entry of judgment in their favor on all plaintiffs' claims. (*See* ECF No. 73 at PageID.512; ECF 74 at PageID.525). By way of example, the Court has addressed plaintiffs Free Exercise Clause claims, even though the Free Exercise Clause is mentioned only once in passing plaintiffs' brief, without any developed argument. (*See* Plaintiffs' Brief at ii, ECF No. 82, PageID.591).

need for a qualified immunity defense"[14] has been flatly rejected.  *See Jones v. Borgerding*, No. 1:14-cv-1265, 2016 WL 5468056, at *8 (W.D. Mich. Sept. 29, 2016). "It is plaintiff[s'] argument that is illogical, unless plaintiff[s are] conceding that defendant[s are]  entitled to judgment in [their] favor on other grounds.  The Sixth Circuit's decision in *Ahlers* [*v. Schebil*, 188F.3d 365, 374 (6th Cir. 1999)] stands for the unremarkable proposition that if a defendant is entitled to judgment in his favor on other grounds, a court may elect as a matter of judicial economy, not to address qualified immunity.  *Jones*, 2016 WL 5468056, at *8. "It is equally appropriate for a court to address the qualified immunity issue and determine whether it provides an additional basis for entry of judgment in the defendant[s'] favor."  *Id.* (collecting cases).

In the context of the First Amendment's Free Exercise Clause, "[a] prisoner alleging that the actions of prison officials violate his religious beliefs must show that 'the belief or practice asserted is religious in the person's own scheme of things' and is 'sincerely held.' " *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001), quoting *Kent v. Johnson*, 821 F.2d 1220, 1224 (6th Cir. 1987).  "Purely secular views or personal preferences will not support a Free Exercise Clause claim."  *Bennett v. Burt*, No. 1:16-cv-1203, 2016 WL 7034240, at *3 (W.D. Mich. Dec. 3, 2016).  "Only beliefs rooted in religion are protected by the Free Exercise Clause."  *Id.* (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 489 U.S. 829, 833 (1989)).  "A religious belief which is not

---

[14](Plaintiffs' Brief at 22, ECF No. 82, PageID.623) (quoting *Tucker v. Pentrich*, 2015 U.S. Dist. LEXIS 13915, at *29 (E.D. Mich. Jan. 13, 2015) and citing *Ahlers v. Schebil*, 188 F.3d 365, 374 (6th Cir. 1998)).

sincerely held or a belief which is purely secular does not require the prison to consider accommodation." *Bennett*, 2016 WL 7034240, at *3 (quoting *Mosier v. Maynard*, 937 F.2d 1521, 1526 (10th Cir. 1991)).

Plaintiff Sabin states in his affidavit that HBF is a "Messianic Christian prison ministry." (Sabin Aff. ¶¶ 2-3, ECF No. 92, PageID.900). Because HBF has no separate existence from Mr. Sabin, it is assumed for present purposes that he is a Messianic Christian. It is further assumed for present purposes that his religious beliefs are sincerely held. Unfortunately, Mr. Sabin's affidavit is silent as what his specific religious beliefs are and what the religious significance of each piece of paper at issue[15] had in his religious belief system. Further, plaintiffs have not filed copies of the specific items that they claim defendants improperly excluded. Thus, there is no foundation for finding of any burden on Mr. Sabin's religious exercise.[16] Given that Mr. Sabin is not confined in prison, he has alternative means of exercising his religious beliefs.

---

[15]The valid, rational connection between the prison regulation regarding inspection of incoming mail for contraband and the legitimate governmental interest put forward to justify it are considered in detail in the next section.

[16]The scope of a prisoner's right to freely exercise his or her religious beliefs lies at the crossroads between competing interests: the right of a prisoner to maintain his or her faith through continued practice and the legitimate interest of prison officials in maintaining order and security in a difficult institutional environment. Determining where to draw the balance between these interests, the Supreme Court of the United States long ago concluded that prison officials may place restrictions upon an inmate's practice of his or her religious beliefs so long as an inmate retains a reasonable opportunity to exercise that faith. *Cruz v Beto*, 405 U.S. 319, 322 (1972). Thus, "[t]he 'free' exercise of religion thus is rather a misnomer in the prison setting[.]" *Johnson-Bey v. Lane*, 863 F.2d 1308, 1310 (7th Cir. 1988).

The Court finds that plaintiffs have not presented evidence on which a reasonable trier of fact could find any violation of their First Amendment rights under the First Amendment's Free Exercise Clause.

Plaintiffs have not addressed or carried their burden on the second prong of the qualified immunity analysis. *See White v. Pauly*, 137 S. Ct. at 551; *Estate of Hill*, 853 F.3d at 312 ("[T]he ultimate burden of proof is on the plaintiff[s] to show that the defendant[s are] not entitled to qualified immunity."); *see also Sumpter v. Wayne County*, No. 16-2102, __ F.3d __, 2017 WL 3568607, at *7 (6th Cir. Aug. 18, 2017); *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 993 (6th Cir. 2017). Plaintiffs have not cited and the Court has been unable to locate any Supreme Court, Sixth Circuit, or other decision finding a violation of the Free Exercise Clause violation under similar circumstances. Defendants are entitled to qualified immunity on all plaintiffs' Free Exercise Clause claims.

B.  First Amendment Freedom of Speech

In Count II, plaintiffs allege that all defendants violated their rights under the First Amendment's Free Speech Clause by unreasonably delaying processing or rejecting mail that they sent to ICF inmates. (Complaint at 6-13, 18-19, ECF No. 1, PageID.6-13, 18-19). In their brief, plaintiffs' claims are characterized as alleging violations of plaintiffs' First Amendment right to "freedom of speech" in sending "uncensored correspondence" to prisoners. (Plaintiffs' Brief at 2-3, ECF No. 82, PageID.603-04 ).

Plaintiffs did not have any First Amendment right to send "uncensored" mail to ICF prisoners. *See Thornburgh v. Abbott*, 490 U.S. 401, 407-14 (1989). Further, the First Amendment did not guarantee that any specific mail items sent by Mr. Sabin, through his sole proprietorship of HBF, addressed to ICF prisoners would be processed within any particular time frame, much less clearly established law with respect each defendant and each item of incoming mail, clearly established law at the time the defendant acted placed the unlawfulness of the official's conduct "beyond debate." *White v. Pauly*, 137 S. Ct. at 551.

Prisoners retain only "those First Amendment rights of speech 'not inconsistent with [their] status as ... prisoner[s] or with the legitimate penological objectives of the corrections system.' " *Hudson v. Palmer*, 468 U.S. 517, 523 (1984) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). "Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent, conduct. Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others." 468 U.S. at 526. The Supreme Court's decision in *Hudson v. Palmer* noted that over a mere eighteen-month span, there had been 120 prisoners murdered by fellow inmates in state and federal prisons, a number of prison personnel murdered by prisoners, 29 riots or similar disturbances, and 125 suicides. In the federal system alone over a one-year period there were 359 inmate assaults on other inmates and 227 inmate assaults on

-33-

prison staff. 486 U.S. at 526. "Within this volatile 'community,' prison administrators are to take all necessary steps to ensure the safety of not only the prison staffs and administrative personnel, but also visitors. They are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves. They must be ever alert to attempts to introduce drugs and other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today; they must prevent, so far as possible, the flow of illicit weapons into the prison; they must be vigilant to detect escape plots, in which drugs or weapons may be involved, before the schemes materialize. In addition to these monumental tasks, it is incumbent upon these officials at the same time to maintain as sanitary an environment for the inmates as feasible, given the difficulties of the circumstances." *Id.* at 526-27.

Incoming mail poses a particularly high threat to prison safety and security. *See Thornburgh v. Abbott*, 490 U.S. at 413. The applicable standard is the deferential *Turner* standard: whether the challenged regulation is "reasonably related to legitimate penological interests." 490 U.S. at 413. It was plaintiffs' burden of showing that the regulation, as applied by each defendant to each item of incoming mail, was not reasonably related to legitimate penological objectives. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("The burden ... is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."); *see also Prison Legal News. v. Livingston*, 683 F.3d 201, 2015 (5th Cir. 2012); *Street v. J.C. Bradford & Co.*, 886 F.2d

1472, 1478 (6th Cir. 1990); *Young v. Weathersby*, No. 1:09-cv-67, 2010 WL 3909463, at *9 (W.D. Mich. Sept. 15, 2010). As previous noted, under the second prong of the qualified immunity analysis it was plaintiff's burden on each claim as to each defendant to show that at the time the defendant acted, clearly established existing precedent placed the unlawfulness of the official's conduct "beyond debate." *Plumhoff*, 134 S. Ct. at 2023; *Mitchell*, 864 F.3d at 424.

In *Turner*, the Supreme Court upheld a total ban against inmate-to-inmate correspondence because it was reasonably related to legitimate penological interests. 482 U.S. at 91-93 ("Undoubtedly, communication with other felons is a potential spur to criminal behavior: this sort of contact frequently is prohibited even after an inmate has been released on parole."). Lower courts, applying the *Turner* standard, have upheld more significant restrictions. Complete bans on correspondence between former and current inmates have been upheld. *See Nasir v. Morgan*, 350 F.3d 366, 372 (3d Cir. 2003).

Plaintiffs' brief contains a discussion of some of the instances where Notice of Package/Mail Rejections were issued. (Plaintiff's Brief at 7-20, ECF No. 82, PageID.608-21). Plaintiffs argue that Notice of Package/Mail Rejection #0411-120, issued by Karber and appealed by plaintiffs, apparently without success, was an "exaggerated response." (*Id.* at 7-8, PageID.608-09) (citing *Turner*). The rejection of the Detroit Free Press article dated April 18, 2011, sent by HBF to prisoner Bout because it provided details regarding another prisoner's crime was reasonably related

to legitimate penological interests. Among other things, this newspaper article contains details of criminal sexual conduct against a 9-year-old victim by an intruder who climbed through the girl's bedroom window and raped her. (ECF No. 82-4, PageID.712).

Plaintiffs' argument to the effect that recognizing defendants legitimate penological interest could justify "censoring all of the published cases in the Michigan Reports, Michigan Court of Appeals Reports and Federal Reporters, etc., explicitly describing the crimes of other prisoners" (Plaintiffs' Brief at 8, ECF. No. 82, PageID.609) is not persuasive. No censoring of a case law reporter is at issue. Newspaper articles do not establish legal precedent. The access to reporters exists because a prisoner retains a First Amendment right of access to court in pursuit of a non-frivolous direct appeal from a criminal conviction, a habeas corpus petition or a civil rights action under 42 U.S.C. § 1983 to vindicate "basic constitutional rights." *Lewis v. Casey*, 518 U.S. 343, 354 (1996).

Plaintiffs argue that the rejection of a "recall petition" HBF sent to prisoner Murphy was not reasonably related to legitimate penological objectives. (Plaintiffs' Brief at 8-9, ECF No. 82, PageID.609-10). The petition was rejected under Notice of Package/Mail Rejection # 0811-054, issued by Lantagne. (ECF No. 82-1, PageID.682) Unfortunately, plaintiffs did not provide the Court with a copy of the recall petition that they now claim was constitutionally protected. Prisoner Murphy was not successful in having this decision overturned through th MDOC's grievance process. He claimed a violation of a right to keep himself informed about Michigan government

and the political process.  The Step II grievance response noted that a blank recall petition was not necessary to educate himself about the political process.  He had alternative means such as books, periodicals, newspapers, radio and television to educate himself regarding the political process.  (ECF No. 82-4, PageID.720).  No court has held that a prisoner has a right to receive blank recall petitions.

Michigan's prison inmates are not entitled to become registered voters.  *See Wyers v. Bannan*, 249 F.2d 136 (1957); *see also Moore v. Michigan Dep't of Corr.*, 2:10-cv-213, 2010 WL 4007609, at *2 (W.D. Mich. Oct. 12, 2010) (Dismissing a prisoner's complaint for failure to state a claim because "persons serving a sentence in jail or prison are not eligible to vote."); *Crowdog v. Genesee County Canvassers*, No. 04-cv-74076, 2005 WL 1027586, at *1 (E.D. Mich. Apr. 20, 2005) (The court finding no violation of a prisoner's constitutional rights by a refusal to send an inmate's request for voter registration forms "because plaintiff was not qualified to become a registered voter and there was no point in bothering the County Clerk with unnecessary correspondence.").  Michigan prisoners cannot provide valid signatures to recall petitions because they are not registered and qualified electors.  *See* MICH. COMP. LAWS §§ 168.954, .958.  The rejection of the recall petition did not violate plaintiffs' constitutional rights.  Plaintiffs' professed desire to have petitions circulated among the families and friends of inmates can be readily achieved by direct mailings by plaintiffs to that target audience.

Plaintiffs argue that under  Notice of Package/Mail Rejection # 0811-061, the map rejected was not a Google map as described in the Notice, but rather a USGS

photograph of "the Sabin homestead" that prisoner Murphy was allowed to receive while he was a prisoner at the Bellamy Creek Correctional Facility. Plaintiffs argue that the rejection of the USGS map (ECF No. 82-4, PageID.723) while Murphy was an inmate at ICF was an exaggerated response under *Turner*. (Plaintiffs' Brief at 9-10, ECF No. 82, PageID.610-11). The Notice describes the item rejected was a "Detailed Map." (ECF No. 82-1, PageID.683). ARUS Smith upheld the rejection of the "Google MAP." The argument that the item was not a map was rejected: "it [was] a MAP and [was] much more detailed than that of a road MAP[.] It says right on the document 'MAP.'" (ECF No. 74-2, PageID.538). The rejection of this item was reasonably related to legitimate penological objectives. The security concern being addressed under the portion of the MDOC's policy directive prohibiting detailed roadmaps is keeping information that would assist in an "escape" out of the prisoner's hands. (Policy Directive 05.03.118, ¶ MM(16), ECF No. 74-3, PageID.556). Keeping the detailed aerial photograph of Mr. Sabin's property out of prisoner Murphy's hands was not an exaggerated response under *Turner*.

Plaintiffs are mistaken when they argue that defendants were required to file a copy of the newspaper article regarding the Attica prison riots. (Plaintiffs' Brief at 11-12, ECF No. 82, PageID.612-13). Plaintiffs are the parties claiming that the rejection of this particular newspaper article violated their First Amendment rights. Plaintiffs had the burden of presenting evidence sufficient to raise a genuine issue of fact for trial based on their claims against defendants based on the rejection of this newspaper article. *See Young v. Weathersby*, 2010 WL 3909463, at *9. Plaintiffs did

not create genuine issues of fact for trial by omitting the document forming the lynchpin of their claims. Plaintiffs have not raised a genuine issue of fact for trial on their claims against defendant Karber based on the issuance of Notice of Package/Mail Rejection # 1011-020 regarding the article about the Attica riots or against defendant Gehoski's upholding the rejection because the item posed a threat to the security and good order of the prison and encouraged criminal activity. (ECF No. 72-4, PageID.540; ECF No. 82-3, PageID.702; ECF No. 82-4, PageID.708, 735).

Plaintiffs' claims with regard to Notice of Package/Mail Rejection # 0911-040 (Plaintiffs' Brief at 10-11, ECF No. 82, PageID.611-12) likewise falter on plaintiffs' failure to provide the foundational document on which the alleged violations of their First Amendment rights are based. The evidence does show that at Step III of the grievance process the MDOC's Grievance and Appeals Section found that the description Lantagne provided in the Notice of Package/Mail Rejection # 0911-040 was deficient. (ECF No. 82-7, PageID.730). The Notice concerned a document described as a "2011-2012 Opinion Petition to the Michigan Legislature." The Grievance and Appeals Section determined that a "new Notice and administrative hearing would be in order, however, the record indicates that the document was returned to the sender on 12-14-11." (ECF No. 82-7, PageID.730).

Plaintiffs argue that the rejection of a 58-page article regarding the psychiatric effects of solitary confinement which was the subject of Notice of Package/Mail Rejection # 1111-115 ( ECF No. 82-4, PageID.740-41) violated their First Amendment rights. (Plaintiffs' Brief at 12-13, ECF No. 82, PageID.613-14). ARUS Gehoski found

that Prisoner Murphy had received mail containing copies of a publication including a table of contents that were not direct from the publisher. She quoted PD 05.03.118 ¶ MM(8) and emphasized that 58 pages was "more than a few pages." (ECF No. 82-4, PageID.741). The publication was not from an approved vendor. (PD 05.03.118, ¶ CC, ECF No. 74-3, PageID.554). Paragraph MM(8) of the policy directive allows a limited exception to the authorized vendor requirement: "This does not apply to an article or a few pages, or copies of a few pages, or copies of a few pages, from a publication that may be included with a letter or other mail, unless it is reasonably believed to be an attempt to circumvent this restriction." (*Id.* at ¶ MM(8), PageID.555). Plaintiffs' argument that they were not limited in the number of pages in any "article" appears to be based on a typographical error where "or" rather than "of" appears in the policy directive. An "article or a few pages" makes no sense because there is nothing for "a few pages" to modify. A few pages of what? An article of a few pages, makes sense, and is consistent with the purpose of creating an exception to the vendors rule allowing for a few pages of an article or other publication. A finding that plaintiffs' mailing did not fit within the limited exception was reasonable. Plaintiffs have not presented evidence sufficient to raise a genuine issue of material fact for trial on claims based on the rejection of this article.

Plaintiffs argue that the mail that was the subject of Notice of Package/Mail Rejection # 1114-142C by Karber and the hearing decision by Gehoski upholding the rejection of sheets of paper listing names, addresses, and telephone numbers was not reasonably related to legitimate penological interests. (Plaintiffs' Brief at 13-14, ECF

No. 82, PageID.614-15). The argument fails for lack of supporting evidence. Likewise, plaintiffs' arguments regarding the mail that was the subject of Notice of Package/Mail Rejection # 1211-037, # 1211-063, # 1211-084, # 0212-073, and # 0113-049, and "others" (*Id.* at 14-20, PageID.616-21) fail for the same reason. Absent the underlying communication, plaintiffs fail to present evidence on which a reasonable trier of fact could find a violation of plaintiffs' First Amendment rights.

The Third Circuit's decision in *Nasir v. Morgan*, is particularly instructive.[17] In that case the court of appeals upheld a ban prohibiting all correspondence between former inmate and a current inmate because, among other things, prisoners can develop code or jargon to prevent detection of their real messages and there would be "an inherent risk of missing dangerous communications both through use of deceptive language and due to the volume of incoming mail that prison staff would be required to read. With regard to the first prong of the *Turner* test, there was a rational connection between the prison regulation in question and the legitimate governmental interest which justifies it. The first element of the *Turner* test was satisfied because correspondence sent by a former prisoner to a current inmate poses a particularly high risk because the former inmate "has greater access to people and items that could lead

_____

[17]*See also Smith v. Parker*, 7 F. App'x 432, 434 (6th Cir. 2001) (upholding rejection of incoming mail under a policy prohibiting inmates at one prison from providing legal assistance to prisoners at another prison); *Jackson v. Pollard*, No. 07-C-28, 2007 WL 1556867, at *3 (W.D. Wisc. May 25, 2007) (Coded prisoner communications "could be used to further drug trafficking, convey escape plans, relay gang messages, plan disturbances, order attacks on staff and other inmates and engage in other criminal conspiracies.").

to crimes outside or inside the prison." 350 F.3d at 372. Alternative means of exercising the right remained available. The restriction did not bar prisoners from all forms of correspondence. At issue was "communication with a limited class of other people with whom prison officials are concerned: former prisoners. Outside of this limited class, prisoners are free to communicate with most any other individual." *Id.* (citation omitted).

In assessing the impact of accommodating the asserted right on other inmates and prison personnel, "communication with former prisoners has a significant potential negative impact on the rights of other inmates and prison personnel; an impact sufficient to justify imposing limits on that communication." *Id.* at PageID. 372-73. The risks include "escape, retaliation, introduction of contraband, and other illegal activity." *Id.* at 373. Finally, the court considered the availability of ready alternatives to the regulation. The only alternative offered was the complete monitoring of inmate correspondence to prevent all dangerous communication. Reading every piece of correspondence from a former inmate would be impossible and create an appreciable risk of missing dangerous messages. The Third Circuit recognized the real possibility that prisoners develop jargon or code to prevent detection of their real messages. There would be an inherent risk of missing dangerous communications, both through the use of deceptive language and due to the volume of incoming mail that prison staff would be required to read and review, it did not present a reasonable alternative to the policy prohibiting such correspondence. *Id.* at 373-74.

The volume of material plaintiffs sent cuts against rather than in favor of their claims. *See Young v. Weathersby*, 1:09-cv-67 2010 WL 3909463, at *8 (W.D. Mich. Sept. 15, 2010) (rejection of mail so voluminous that it could not easily be readily reviewed for contraband or other threats passed review under *Turner* because a contrary rule would allow the sender simply to hide harmful content in a sufficiently large quantity of other papers to thwart detection); *see also Hall v. Johnson*, 224 F. Supp. 2d 1058, 1060 (E.D. Va. 2002) (upholding policy where all general purpose correspondence over one ounce in weight was rejected because it "further[ed] the legitimate governmental interest of institutional security because it allow[ed] mail room personnel to quickly scan a shorter document for potential security risks, such as escape plans").

In summary, the Court finds that plaintiffs have not presented evidence on which a reasonable trier of fact could find in plaintiffs' favor on any claim under the First Amendment's Free Speech Clause against defendants.

Further, the Court finds that defendants are entitled to judgment in their favor because plaintiffs have not carried their burden under the second prong of the qualified immunity analysis. *See Johnson v. Moseley*, 790 F.3d at 653. Plaintiffs have not shown that the rejection of any item of incoming mail by defendants violated any clearly established constitutional right. *See White v. Pauly*, 137 S. Ct. at 551-52. Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments[.]" *Carroll v. Carman*, 135 S. Ct. at 350. Thus, even if plaintiffs

had presented evidence that a defendant or defendants made a mistake in rejecting one or more of the items of incoming mail, plaintiffs would still fall well short of showing that at the time the defendants acted existing precedent placed the constitutional question "beyond debate." *See White v. Pauly*, 137 S. Ct. at 551.

Plaintiffs' claims based on perceived delays in processing mail and conducting administrative hearings, deciding grievances, or sender's appeals fare no better. Under the second prong of the qualified immunity analysis it was plaintiffs' burden to demonstrate that the right each official is alleged to have violated was "clearly established" in a particularized sense. The Supreme Court and the Sixth Circuit have never recognized a constitutional right for a convicted felon and/or his sole proprietorship, sending voluminous materials through the mail to prisoners in a high security prison, to have such materials processed by employees in the prison mail room, hearing officers, or the warden within any specific time frame. The unpublished district court cases cited by plaintiffs are not remotely analogous, and do not clearly establish the constitutional rights that plaintiffs claim. Two decisions from outside the Sixth Circuit warrant brief examination because they illustrate the unsettled nature of the law in this area.

In *Rowe v. Shake*, 196 F.3d 778 (7th Cir. 1999), the Seventh Circuit suggested that a claim based on interference delaying a prisoner's timely receipt of incoming mail from a non-attorney was possible, but held that the relatively short term and sporadic delays alleged by the plaintiffs failed to state a First Amendment claim. *Id.* at 782. In *Ahlers v. Rabinowitz*, 684 F.3d 53 (2d Cir. 2012), the Second Circuit found it

unnecessary to articulate a standard for a claim based on an alleged delayed receipt of mail because the plaintiff could not support a claim that the purported interference with his non-legal mail was regular or unjustifiable. The Second Circuit found that the plaintiff had alleged several brief delays and that was insufficient to state a claim. *Id.* at 64. Plaintiffs have not carried their burden and defendants are entitled to qualified immunity.

### C.   Retaliation

In Count III, plaintiffs allege that defendants Karber and Lantagne retaliated against them in violation of their First Amendment rights. (Compl. at 20-21, ECF No. 1, Page ID.20-21). On summary judgment, a plaintiff asserting a First Amendment retaliation claim must present evidentiary proof on which a reasonable trier of fact could find (1) that the plaintiff had engaged in conduct protected by the First Amendment; (2) that an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from engaging in that conduct; and (3) that the adverse action taken against the plaintiff was motivated, at least in part, by the protected conduct. *Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*). The plaintiffs have the burden of proof on all three elements. *See, e.g., Murray v. Evert*, 84 F. App'x 553, 556 (6th Cir. 2003).

Plaintiffs have not presented evidence on which any reasonable trier of fact could find in their favor on any of the three elements of a First Amendment retaliation claim against defendants Karber and Lantagne. Plaintiffs have not presented evidence that Mr. Sabin was engaging in constitutionally protected conduct. They have not presented

-45-

evidence of actions taken by defendants Karber and Lantagne regarding the processing of incoming prisoner mail that would deter a person of ordinary firmness. Plaintiffs have not presented evidence that actions taken were motivated, at least in part, by constitutionally protected conduct.

Plaintiffs have not presented evidence that the actions of defendants Karber and Lantagne violated any clearly established constitutional right. The Supreme Court has repeatedly emphasized that the second prong of the qualified immunity analysis must be undertaken in light of the specific context of the case, not as a broad general proposition. *See White v. Pauly*, 137 S. Ct. at 552. Courts are not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. *Id.* In order to be clearly established, existing precedent must have placed the unlawfulness of the official's conduct "beyond debate." *Plumhoff*, 134 S. Ct. at 2023; *Mitchell*, 864 F.3d at 424.

D. <u>Freedom of Association</u>

In Count IV, plaintiffs allege that defendants' actions violated their First Amendment right to freedom of association. (Compl. at 20-21, ECF No. 1, PageID.20-21).

In *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003), the Supreme Court emphasized that the "very object of imprisonment is confinement. Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper incarceration. And, as our cases have

established, freedom of association is among the rights least compatible with incarceration." The Court went on to hold that the MDOC's regulation prohibiting visitation by former inmates bears a self-evident connection to the State's interest in maintaining prison security and preventing future crimes. We have recognized that 'communication with other felons is a potential spur to criminal behavior.'" *Id.* at 133-34 (quoting *Turner v. Safley*, 482 U.S. 78, 91-92 (1987)).

The associational rights of non-prisoners are no greater than the rights of prisoners with whom they wish to associate. *See Thornburgh v. Abbott*, 490 U.S. 401, 410 n.9 (1989); *Akers v. McGinnis*, 352 F.3d 1030, 1047 (6th Cir. 2004) (Judge Clay concurring in part and dissenting in part). Plaintiff HBF has no rights of its own. Plaintiff Sabin's associational rights are no greater than the rights of prisoners. Mr. Sabin is a convicted felon and registered sex offender. Plaintiffs have not carried their burden of demonstrating how the action of each defendant with regard to each item of incoming mail violated plaintiffs' clearly established First Amendment right of freedom of association.

E.    Other Unsupported Claims

Plaintiff's complaint lists a number of other Notice of Package/Mail Rejections (*See* ECF No. 1, PageID.7-13), but plaintiffs did not present evidence in support of any of those claims. The Court has not been provided with the Notice of Package/Mail Rejections, Hearing Decisions, or copies of the papers allegedly wrongfully excluded.

Defendants state that these are instances where the mail rejections were overturned or rescinded and the mail was received by the intended prisoner recipient.

Further, defendants state that plaintiff's have "no claim of action" under such circumstances. (Defendants' Brief at 3, PageID.74). Although defendants should have cited some case law regarding the requirement of injury in fact,[18] the Court does not find the error warrants that the issue be deemed waived. Plaintiffs response was to argue that "inordinate delays" in a prisoner's receipt of mail can be sufficient to support a claim where the mail reaches its intended audience. (Plaintiffs' Brief at 3, ECF No. PageID.604). Again, there is no foundational evidence on which a reasonable trier of fact could find that these defendants violated plaintiffs' constitutional rights or that any delay was unconstitutional. Further, simply labeling a delay as inordinate does not suffice. Plaintiffs have not satisfied their burden of coming forward with evidence, legal authority, and focused argument showing how the actions of each defendant in connection with the processing of each of these incoming mail items violated plaintiffs' clearly established constitutional rights. The Court finds that defendants are entitled to judgment in their favor as a matter of law on these claims.

## III.   Supplemental Jurisdiction

Plaintiffs ask the court to exercise jurisdiction over purported state-law claims. (ECF No. 1, PageID.2; *see also* Plaintiffs' Brief at 20-21, ECF No. 82, PageID.621-22). "Supplemental jurisdiction is a doctrine of discretion, not of plaintiff's right." *Habich v. City of Dearborn*, 331 F.3d 524, 535 (6th Cir. 2003). Generally, where all federal claims have been dismissed, federal courts decline to exercise supplemental jurisdiction

---

[18]*See e.g.*, *Spokeo v. Robins*, 136 S. Ct. 1540, 1547 (2016).

over state-law claims. *See* 28 U.S.C. § 1367(c)(3); *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir.2009); *see also Shaver v. Brimfield Twp.*, 628 F. App'x 378 384 (6th Cir. 2015). There is no reason in this case to depart from the general rule.

## Conclusion

For the foregoing reasons, defendants' motion for summary judgment (ECF No. 73) will be granted and judgment will be entered in defendants' favor on all plaintiffs' federal claims. The Court, in its discretion, declines to exercise supplemental jurisdiction over plaintiffs' purported state law claims.

Dated:   September 20, 2017        /s/ Paul L. Maloney
                                    Paul L. Maloney
                                    United States District Judge